36 N.J. Super. 46 (1955)
114 A.2d 757
CHARLES S. SCHERMER, STELLA SCHERMER, HIS WIFE, ALVIN DASCHELL, MARY DASCHELL, HIS WIFE, SAMUEL MILLER, ANNE MILLER, HIS WIFE, ANTHONY J. BUSACCA, ANGELINE BUSACCA, HIS WIFE, JOSEPH CASACECCIO, MAY CASACECCIO, HIS WIFE, PHILIP J. DUFF, ADA A. DUFF, HIS WIFE, JOSEPH L. WEINTRAUB, EDITH WEINTRAUB, HIS WIFE, DANIEL WILNER AND ELYSE WILNER, HIS WIFE, PLAINTIFFS,
v.
FREMAR CORP., A NEW JERSEY CORPORATION, AND R.B. WILLIAMS, JR., BUILDING INSPECTOR OF THE CITY OF MARGATE CITY, IN THE COUNTY OF ATLANTIC AND STATE OF NEW JERSEY, DEFENDANTS.
Superior Court of New Jersey, Chancery Division.
Decided May 31, 1955.
*48 Mr. James M. Davis, Jr., for plaintiffs (Messrs. Powell & Davis, attorneys).
Mr. Clarence Blitz, for defendant Fremar Corp.
Mr. Enoch A. Higbee, Jr., for defendant R.B. Williams, Jr.
HANEMAN, J.S.C.
This is a motion for summary judgment by the defendant, Fremar Corp.
The facts in connection herewith, as demonstrated by the affidavits and exhibits herein filed, are as follows: On February 7, 1955 R.B. Williams, Jr., Building Inspector of the City of Margate City, issued a building permit to John Low & Sons as builder and Fremar Corp. as owner, for the erection of a structure at Cedar Grove and Atlantic Avenues, Margate City, New Jersey, the plans for the same having been theretofore filed with the said building inspector. The plans as so filed show that the structure to be erected contains at least 47 separate units, in which units there is provision for at least 69 bedrooms. The building as proposed to be constructed is in a U-shape, being two stories in height. At the base of the U there is no structure on the first floor, an open entrance being afforded thereby to the center of the U. On the second floor, however, bridging this entrance, there are constructed several apartments or bedrooms. The heat for the entire building is supplied from one heater room. In 38 of the units provision is made for kitchenettes.
On January 31, 1955 the Fremar Corp. entered into a building contract with John Low and Sons for the construction of the building here involved. Shortly prior to entering into said contract the Boardwalk National Bank of Atlantic City agreed to advance the sum of $162,000 upon a construction mortgage for the erection of this building. On April 25, 1955, the date upon which summons was served upon these defendants, the buildings were approximately two-thirds completed *49 and the Fremar Corp. had expended in excess of $100,000 in connection with the construction.
Plaintiffs argue that the issuance of said building permit was in violation of the building zone ordinance of the City of Margate City and that they as adjoining owners will sustain special damage as a result of the violation.
Defendants allege, and it is admitted, that the land here involved is located in a Dwelling C Zone. The ordinance, as far as here material, concerning dwellings in the Dwelling C Zone, provides as follows:
"Section 6. Dwelling C Zone Uses. Within any DWELLING C Zone no building shall be used in whole or in part for any industrial, manufacturing, trade or commercial purpose or for any other than the following specified purposes:
1. Any use permitted and as regulated in Sections 5 and 5-A."
Sections 5 and 5-A of said ordinance referred to in section 6, as far as here material, provide as follows:
"Section 5-A. Dwelling B Zone. Within any DWELLING B Zone no building shall be used in whole or in part for any industrial, manufacturing, trade or commercial purpose or for any other than the following specified purposes:
2. Hotels, apartment houses or hotel-apartments having not less than 50 bedrooms for guests, or 50 so-called master bedrooms, * * *"
Plaintiffs actually bottom their argument upon the following contentions: (1) the defendants are constructing a building of two separate units and not one building; (2) the plans delineate only 42 units instead of 50 units as required by the ordinance; (3) the plans provide for a large sign and parking space, as is customarily maintained for a motel, and the building is therefore not a hotel, apartment house or hotel-apartment.
In order for the defendants to succeed upon a motion for summary judgment it must be shown palpably that there is no genuine issue of fact remaining. The affidavits and exhibits here offered show palpably that there is no such issue of fact remaining. Judson v. Peoples Bank & Trust Co. of Westfield, 17 N.J. 67 (1954).
*50 In connection with plaintiff's first argument, I find that the defendants are constructing a building which is, to all intents and purposes, a single building and not two separate buildings. Conceding that on the ground floor there is a division between the two wings which extends the full length of the two uprights of the U, the two wings are connected on the second floor at the base of the U by the construction of rooms for sleeping purposes. It is further to be noted that the heat for all of the units is supplied by one heater room located in one of the uprights of the U. I find, therefore, that this is a single building.
Insofar as the plaintiffs' second argument is concerned, my computation shows that the plans delineate at least 47 separate units in which provision is made for at least 69 rooms designated either as "bedrooms" or "living bedrooms." A bedroom has been defined as follows: "A room furnished with a bed and intended primarily to be slept in." Webster's New International Dictionary. The affidavits demonstrate that these "bedrooms" and "living bedrooms" are to be used as and for sleeping purposes. The rooms are designed to meet this definition. I find plaintiffs' second argument without merit.
There remains for consideration plaintiffs' third argument.
Both the plans and the architect's sketch show that the defendants are constructing a two-story combination hotel or motel and apartment house. Plaintiffs argue that there is a distinction between a motel and a hotel.
The initial zoning ordinance of the City of Margate was dated September 11, 1930 and was from time to time amended to September 28, 1944. It is of common knowledge that in the year 1930 motels were practically unheard of. Since 1944, with the great use of automobiles, there has been a tremendous development throughout the entire United States in the construction of buildings which furnish lodging accommodations for transients and which buildings are denominated motels. These lodging accommodations may be for a short period of time, such as for overnight, or may, especially in resorts, be for a longer period of time, such as *51 weeks or months. Where the guests' residence is for the longer period, the units are quite frequently constructed with cooking facilities by the inclusion of a kitchenette. Basically and essentially, where the accommodations are without cooking facilities, the same service is furnished as is furnished in the average hotel. Where such kitchen facilities are provided, the same service is furnished as is furnished in so-called "efficiency apartments." These motels have filled a required need for housing accommodations for transients, making available to them accommodations quite generally more conveniently located for access by the travelling public than the normal hotel, and having greater facilities or accommodations for parking of automobiles immediately adjacent to the building itself. The mode of operation of the average motel results as well in a great deal of "self-service" on the part of the guests and a reduction in the cost to the guest by way of gratuities.
Originally, in order to constitute a building an inn or a hotel, which words are synonymous, it was required that a transient be provided lodging, food, drink and accommodations for stabling his horses. Over the years, in order to meet the changed modes of travel, customs and habits of the people, these requirements have changed, until in modern times it is no longer vital that food, drink and stabling accommodations be furnished.
A hotel is essentially an establishment which provides lodging for transients, and a place which would otherwise be an inn or hotel does not lose its character as such because of its mode of construction, the appellation bestowed on it by the proprietor, or the fact that food and drink cannot be obtained therein, or are available at the option of the guest.
In modern usage, it may be generally regarded that establishments which furnish lodging to transients, although designated motels, may be deemed hotels. The word "motel" generally denotes a small hotel where lodgings are available for hire, with a minimum of personal service being furnished by the proprietor. See 43 C.J.S., Innkeepers, § 1, p. 1128 et seq.; 28 Am. Jur. 538 et seq.; Friedman v. Shindler's *52 Prairie House, 224 App. Div. 232, 230 N.Y.S. 44 (App. Div. 1928), affirmed 250 N.Y. 574, 166 N.E. 329 (Ct. App. 1929); Edwards v. City of Los Angeles, 48 Cal. App.2d 62, 119 P.2d 370 (Ct. App. 1941); Woods v. Western Holding Corp., 77 F. Supp. 90 (D.C. 1948), affirmed 173 F.2d 655 (C.C.A. 8, 1949); Langford v. Vandaveer, 254 S.W.2d 498 (Ky. Ct. App. 1953).
An apartment house has been defined as a building consisting of more than one story, designed so that on each floor there are one or more suites of rooms fitted for housekeeping purposes, including a kitchen or kitchenette in each housekeeping unit. Lignot v. Jaekle, 72 N.J. Eq. 233 (Ch. 1906).
It is therefore seen that 38 of the units might, under the above definition, be deemed to be apartments, and to that extent the building here involved could be classified as an apartment house, or recognizing the presence of such kitchenettes in many motels, the entire building could be classified as a hotel. In either event, the building as designed meets the definition of a "hotel(s)" or "apartment house(s)" or a combination of the two terms, as used in the ordinance here under consideration.
Judgment for defendants will be entered accordingly.